Good afternoon, Your Honour. It will please the Court, on behalf of Nishchal Bhattarai, who is serene. In this matter, my client, Mr. Bhattarai, was denied his due process rights to a fair hearing. His testimony, his declaration, his documentation was given no weight. The immigration judge looked specifically to see what was missing in his documentation in rendering her decision. She never, ever confronted, informed, or told my client at any time during the proceedings there was anything missing. She gave no weight to his declaration, no weight to his sworn testimony, which was consistent, or to his corroborating documentation. She lasered in on the documentation corroboration on words or dates that were missing. She never looked at the documents as a whole. She never looked at them cumulatively. Basically, in this circuit, my client is allowed and is meant to be given notice if there's a defect. And no time did he present his brother, did he provide a declaration of his brother, or state his brother was going to testify. I want to make sure I understand what you're arguing. Are you saying that his testimony was consistent with the medical notes? Because that seems like what the IJ seemed to focus on, one of the things that the immigration judge seemed to focus on. And it does appear that the medical notes were somewhat inconsistent from what the, Mr. Baderai said in his testimony and then also previously. He said he fell, the medical notes said that Mr. Baderai fell on the road and they completely omit any injuries regarding his head, or to his head and to his body, which seems inconsistent from what he described happened in 2010. That's correct, Your Honor. There were notes. He was never confronted with those notes. She raises it for the first time in a decision. If she had an issue, that is the immigration judge, she should have asked Mr. Baderai and should have asked for a medical report. There is no medical report. Those are notes of a hospital or of a doctor. There is no medical report. She never gave him an opportunity to address those issues that you have just raised. Well, you don't seem to, you seem to be arguing that now. I don't know that you really squarely addressed that in your briefing. We raised the issue of notice and due process, Your Honor, in all of our briefings from day one. But we didn't specifically narrow ourselves on the medical notes. We did mention there was no medical report and medical notes on a medical report. So we don't know what the medical report would say because he was never asked for a medical report. Do we even know if there is what you're now calling a medical report? No, we don't know if there is one, Your Honor. As he was a refugee, he tried to provide and meet his burden by his testimony and try and bring whatever documents he could. He's a worker. He was affiliated with the United Nations. He was a human rights activist. He tried his best to get whatever documentation he did. He tried to get police reports. He tried to get other reports which verify the content of his claim, as well as the positive of his claim was verified by the United States Department of State in its reports. They weren't weighed. None of his testimony, none of his documentation was ever weighed. None of it was given any consideration. What was considered was what was missing. Always there was something missing. I noticed that the IJ decision comes down in early August, and our Wren decision comes down later that same month. Did you ask the IJ to reconsider in light of Wren? No, but we did ask the BIA, and we provided the BIA. That was the first notice of the documentation. We provided the BIA additional documentation that the judge raised, and they said, why couldn't it have been provided at the first hearing? And they were aware of Wren. Wren was argued before the Board of Immigration Appeals. And, of course, the availability or unavailability or ease of availability isn't the question under Wren. The question under Wren is notices of possible relevance. Correct. So what the BIA says is not really consistent with what Wren is driving at. It's an inconsistent decision with this Court of Appeals. If there are no other questions, I'd like to keep my balance of records. I do have another question. You argue that the country report, and I'm not sure I understand that with respect to the CAT claim, because it clearly did consider the country report. I was considering it in the issue of credibility, whether it's plausible what he was saying, whether there were, in fact, militant Maoist aggressive terrorists at that time looking and seeking out opponents of the communists in Nepal at that time. And in the 2008 report, his testimony is verified objectively. It was towards the credibility as compared to the Convention Against Torture claim, as the issue really was adverse credibility. And the judge never considered and was meant to have considered the report as well as to testify to see if his testimony was plausible and believable. She never considered anything that was consistent with his testimony is what we're trying to say, Your Honor. Got no other questions? Okay. Let's hear from the government. You've saved just a little over four minutes. Good afternoon. May it please the Court. Richard Sanfordine on behalf of the government. First of all, just to respond, the Wren case dealt with an otherwise credible alien. In this case, the petitioner was inconsistent on critical points of his claim. But I want to also mention one thing. Well, it seems to me that the IJ was a little unclear as to whether or not she would have found him credible had there been corroborating evidence. I'm not sure that she said, I need the corroboration because he's otherwise incredible. Well, the immigration judge pointed out that she did not find him credible because she found some of the critical documents did not jive with his testimony, which undercut his claim. In fact, early in her decision, she actually refers to the alleged harm as an overarching concern. It wasn't a matter of where she said, well, I believe he was involved in this, but not this. There were certain aspects of his claim that he tried to buttress with documents that she simply did not believe resulted in her not believing the claim. But regarding Wren itself, and even the thrust of what Wren's trying to get at, because the thrust of notice in general is to prevent surprise. That's generally the case in any area of law. The reason we have notice is to prevent unfair surprise. Petitioner was asked 19 questions from the DHS and the immigration judge about the presence, whereabout, and knowledge of his brother. And I would add to every word of it, what happens there is, initially, the DHS says to Petitioner, you have a brother in the United States, correct? Yes. Does he know about these things? Answer, yes. Continues, he knows about my difficulties with the Maoists. My brother knows about the struggles I went through. The questions then continue, he lives with you, yes? Finally, the immigration judge steps in for a question, where is he? Why didn't you bring him to court today? The DHS continues, and over the course of the transcript, the supposed knowledge of Petitioner's brother starts to get walked back in this, saying, well, maybe he doesn't know anything. Maybe he had to work today. The immigration judge, in response to an objection, overrules it, continues the line of inquiry about where he is in his availability that day, saying that it goes to credibility. The DHS then continues the questions. They press on for seven more questions, even beyond the immigration judge saying, I'm going to allow this line of inquiry, it goes to credibility. After that, there's no redirect. The immigration judge offers redirect. This would have been an opportunity, particularly under Wren, not just for notice, but an opportunity to say, well, this is what, to explain what happened to, in this case, a corroborative witness, and an opportunity to provide additional information in the form of the corroborative witness. There's then a 16-day continuance. The immigration judge noticed this, notes this in her decision at page 125 of the record, stating, in the interim, between the two periods, there had been no motion to continue. She notes that in her decision to say, this still didn't come forth. We discussed it. On his appeal to the board, when this matter is filed to the board, Petitioner again, as he's discussed, files a motion to remand. I want to also point out to the Court that the four documents he submitted, none of which were what the immigration judge mentioned in her decision. So even again, to the extent that he's raising a hue and cry that I did not, I could not have possibly seen, despite being asked all these questions and despite declining the opportunity to redirect, that I would not need to fill this information in. He still did not plug the corroborative hole in that the immigration judge was struggling with. But let me also quickly. Kagan. Well, let me just back up a little bit. So do you concede he should have been, Mr. Baderai should have been given a chance to explain the medical notes? The medical? The medical notes. I'm wanting to back up a little bit. Oh, I'm sorry. Yeah, I know. I'm just trying to understand your argument. So do you concede that under our case law that Mr. Baderai should have been given a chance, because you argue in your brief in support of the adverse credibility determination that the IJs found him inconsistent because of the medical notes, right? That's one of the basic issues. All right. Do you concede that he should have been given an opportunity to explain that under our case law? Well, Your Honor, I think, well, first of all, of course, and you know I'm going to go with this, they did not actually raise this to the boards. They failed to exhaust that point. But in this case, this was a documentary inconsistency. It wasn't that he testified early in the proceedings, I never lost consciousness during this beating. I was completely aware of the whole thing. And then later on says I wasn't conscious, which case, certainly under this court's case law, the immigration judge should say, wait a second, you just said earlier you had not lost consciousness. Now you're saying you did. What's going on there? In this case, this is his own documentation that the immigration judge reviews and sees doesn't jive together. But even still, of course, he does not. I'm sorry. Is that yes, an answer to my question, or no, an answer to my question? Your Honor, I'm not. I mean, the Z case says when somebody is determined to be, you know, noncredible, they should be given a chance to explain whatever the fact is that the IJ is relying on. Here it's the medical notes. And it seemed like from your briefing, it looked like that was one of the main reasons that you were saying that substantially supports the IJ's adverse credibility determination. I'm not certain that necessarily for a documentary inconsistency compared to someone who's internally inconsistent during his testimony, I would have to, I would certainly not be surprised if that were the case. Okay. So, but you're saying The problem, of course, again, by the way, we've not seen this point raised. And so, by petitioner, so it's hard to know offhand whether to say, well, I should have been given notice that she was going to use this. He was attempting to use the point of the brother and has from the beginning to say that the lack of notice about that you were going to want my brother to come testify has been the foundation of his claim about a Wren violation and no notice. And so you're focusing on the brother now? We are, because that's what he raised to the board. And so it's very difficult if he doesn't go to the board and say, these are the points that I didn't raise or that I should have been notified about. He's using notice as an overarching issue to be sure, certainly. And I just want to make sure, why do you, and what's the adverse credibility determination, the crux of the brother not showing, because it seems like it's just if we find that he was consistent or he wasn't, the medical records didn't deem him to be not credible. And he should have been given a chance to answer that. How is he otherwise not credible? The police report also, as well, Your Honor. The police report, which, by the way, again, pages 152 to 153 of the transcript. Petitioner, before the first question has even been asked on direct examination, the government raises an objection and says he's trying to submit a purportedly government document. He hasn't authenticated it. Petitioner's own counsel tells the immigration judge, essentially, I, Petitioner's counsel, will follow up with this. I will ask Petitioner. So I'm on these pages. Where exactly are you reading from? Transcript pages. Sorry, I said transcript. Administrative record pages, 152 to 153. Yeah, I'm on those pages. So what are you looking at? Mr. Saron, to judge. And they're referring to the regulations regarding authentication. As far as the court, the rest are not government forms. Hang on a second. Where are you reading from? I'm sorry. The last line of 152? Apologies, Your Honor. Yes, sir. Okay. The rest are not government forms or either NGOs or schools or his political party. We're now, of course, on page 153. Yeah. In so far as the police report is concerned, he, as counsel correctly stated, can testify how he obtained it. And he can testify what happened. And it's solely provided because the law changed. I'm going to quickly then turn to record pages 124 to 125. The immigration judge points this out in her decision. She says, in her decision, she points out that when it came to the police, the purportedly official police document, she was essentially told by her, by the Petitioner's counsel, we will explain how he came to get this unauthenticated document. The police case does not mention the abduction, and it does not mention the presence of a gun. There's one thing that police. But I thought you were talking about authentication rather than what the document actually says. Well, Your Honor, what happens is she then does not give it necessarily the weight that he would like to have provided. Because? Because he did not authenticate the document, which Petitioner's counsel stated at transfer pages 152 to 153 that it could go to weight. The immigration judge invokes that at pages 124 to 125. Okay. Now, let me come back to the brother, if I may. At the end of the testimony, right after we've the testimony about the brothers  the hearing, the I.J. says the record is closed. Yes. Next thing that happens is we get the decision from the I.J. Well, we have another. It's not a written decision on this issue. What happens is 16 days later, they reconvene the hearing. And again, as the immigration judge points out in her decision, no one applied to her for a motion to continue. No, that's actually what I'm about to say. That's right. So on August the 3rd, we get the decision from the I.J. And at that point, she says the absence of the brother and his failure to testify severely undercuts his testimony. But she's now holding it against him now for not having made some motion between the time she says the record is closed and the time that she announces her decision saying that it cuts severely against your credibility that your brother didn't testify. Am I mistaking what happened? Well, Your Honor, we think what happened in that case is the immigration judge and the DHS questioned Petitioner extensively. I read that. They questioned him extensively. They offer him the opportunity to say, where is he? What does he know? That answer sort of changes as he becomes more aware of what's going on. No, you said that. Yes. So when the record is closed, what the immigration judge is pointing out in her decision, there has been now a 16-day delay to reconvene for the hearing. No one applies to her for a motion to continue. I get that, too. But what I'm saying is until we get the decision from the IJ, it's only guesswork as to how much importance she will attach to that, given his other testimony, given the records that he puts in and so on. So the Wren argument would be until she comes out and says the absence or the failure of your brother to appear and to testify severely undercuts. You know, lawyers ask all kinds of questions all the time about why isn't this person here, why isn't that person there, and how much attention the judge will pay to that is pretty much up in the air. Well, the immigration judge did point out to Petitioner's counsel that this line went to credibility. This line of inquiry went to his credibility. And so, again, we think a reason, especially in Wren, which would deal with an otherwise credible alien, in this case the Petitioner was on notice that the immigration judge was, frankly, losing track of which way to go on this. This is, again, and Your Honor knows, the immigration judge hearings are not the same as, say, a district court case. The immigration judge is trying to figure out what to believe. Of course. Well, a district judge is trying to figure out what to believe, too. I learned from Anne Arnold this morning it's counting up and so on. I know you're over time, but if there are further questions on the bench, please feel free. Okay. Thank you. They warned me about that this morning. So when the numbers start going up, you need to step away. Okay. Thank you. Your Honor, you're correct. There was no continuance. The hearing was closed. And there was further, there was no request for a continuance. There was nothing at the end there where, now, I don't know whether you were the lawyer in front of the IJ. Yes. The judge never mentioned anything. She closed the hearing. But you never said, you know, I can see that you may be interested in what the brother has to say. Can I have a continuance in order to get the brother in here? That did not happen. That did not happen because he wasn't a corroborating witness. He knew nothing. He wasn't there. Well, he might have been a corroborating witness in the sense of what his parents might have told him. But he obviously was not there. And the passport information that you provide later shows that. Correct. Now, as far as what counsel just mentioned, the three things I want to just bring to his attention and to the courts, there was no objection made to any of the documents. So I don't know what counsel is talking about authentication. Government counsel and the judge admitted every document into the record without objection. So once it's admitted without objection, why should it be authenticated? There was no objection raised and nor any issue of weight. So all of the group exhibits were admitted in the beginning of the hearing. Wait a minute. I'm on page 152. This is Mr. Stern, the government lawyer. I'm about in the middle of that page. Mr. Stern says, the judge, it's hard to know what their value is. So without authentication, the government is going to object any time or reliance on them. Now, I'm not sure what them includes. I think it is the more information. I'm looking at page 000149, page 17, line 16. Judge to Mr. Stern. Any objection from A through GG, Mr. Stern? No, Your Honor. And they were admitted at that time. And that's on page 17 of the transcript and 00149 of the report. So what's the objection to that I'm reading on 152? Because it says the government is going to object any type of reliance on them. What's them referred to? Well, it's unclear. She's talking of what documents. She's saying it should go through the U.S. Embassy. The Ninth Circuit clearly states the documents can be self-authenticated. That's one issue of authentication. And insofar as the police report, why wouldn't you give it any weight? The police report states he was beaten by the Maoists on March 10th. I mean, on March 9th. If you're going to read a document, read it in its entirety. The Nepal police verified this United Nations worker was beaten by Maoists and money was stolen. So where's the weight to that? But I think you're overstating the matter when you say there was no objection. The government very clearly says I'm objecting to them after having talked about quite a few documents. So I'm not objecting to their admission, but then there's very clearly an objection that goes at least to their authenticity and therefore weight. And they can be self-authenticated in counsel. I mean, I'm stating, Your Honor, basically he authenticated them that he got the police report. It's his police report, and there's no issue regarding it not being a Nepali police report. Government counsel is concentrating on one form of authentication through the U.S. Embassy. Now, so you're stating I'm now on the top of 153. He can testify how he obtained it. He can testify what happened. Now, did, in fact, he testify as to how he obtained the documents? No. So why not? Because it was never raised during the issue, during the hearing. Well, it had been raised at the beginning. Authentication, correct. And you're responding he can testify, but he didn't. He didn't testify because no questions were asked. Well, you could have asked the question. Correct. But it wasn't raised as an issue by government counsel that the police report was an inconclusive document. That was raised by the judge in her written decision after closing the hearing. The issue over here is why not give his testimony any weight, his documents any weight? You're correct. If you're looking at both ways, you're weighing them at this time, Your Honor, but the judge never weighed it. She also gave it any weight whatsoever. She was just looking at what was wrong, what was missing. Now, counsel says there's nothing that was provided. His letter from UNESCO from the United Nations clearly indicates he was kidnapped, beaten, and robbed by the Maoists. Okay. Thank you. Okay. Thank both sides for their argument. Batari versus Lynch was now submitted. The next case on the argument calendar this afternoon.
judges: W. Fletcher, Murguia, Owens